The following is the PDF of an official transcript.  Official

transcripts may be filed in CM/ECF only by the Official Court

Reporter and will be restricted in CM/ECF for a period of 90

days.  You may cite to a portion of the attached transcript by

the docket entry number, referencing page and line number,

only after the Court Reporter has filed the official

transcript; however, you are prohibited from attaching a full

or partial transcript to any document filed with the Court.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION


 3


 4  UNITED STATES OF AMERICA,      )
                                   )
 5             Plaintiff,          )
            v.                     ) CIVIL ACTION FILE
 6                                 ) NOS. 1:22-CR-00283-VMC-CMS-7
    CHROSTOPHE MERANI and          ) and  1:22-CR-00283-VMC-CMS-8
 7
    CHRISTOPHE MERANI              )
 8  and GLENN LAKEN,              )
                                  )
 9             Defendants.        ) MOTION HEARING
    _____)
10


11


12  -------------------------------------------------------------

13       BEFORE THE HONORABLE VICTORIA M. CALVERT

14            TRANSCRIPT OF PROCEEDINGS

15              AUGUST 4, 2023

16
    -------------------------------------------------------------
17

18


19      Proceedings recorded by mechanical stenography
          and computer-aided transcript produced by
20

21          WYNETTE C. BLATHERS, RMR, CRR
               Official Court Reporter
22              2114 U.S. Courthouse
              75 Ted Turner Drive, SW
23             Atlanta, Georgia  30303
                 (404) 215-1547
24

25
```

```
 1 │ APPEARANCES:
   │
 2 │ For the Plaintiff:          NATHAN P. KITCHENS
   │                             TAL C. CHAIKEN
 3 │                             CHRISTOPHER HUBER
   │                             Office of the U.S. Attorney
 4 │                             Northern District of Georgia
   │                             600 United States Courthouse
 5 │                             75 Ted Turner Drive SW
   │                             Atlanta, Georgia  30303
 6 │
   │ For the Defendant           CHARLES P. BORING
 7 │ Christophe Merani:          JOSHUA A. MAYES
   │                             Attorneys at Law
 8 │                             Robbins Alloy Belinfante
   │                             Littlefield LLC
 9 │                             500 14th Street NW
   │                             Atlanta, Georgia  30318
10 │
   │ For the Defendant           DONALD F. SAMUEL
11 │ Glenn Laken:                Attorney at Law
   │                             Garland, Samuel & Loeb, P.C.
12 │                             3151 Maple Drive NE
   │                             Atlanta, Georgia  30305
13 │
14 │
15 │
16 │
17 │
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
```

```
1                    Friday Afternoon Session

2                       August 4, 2023

3                         1:30 p.m.

4                          -  -  -

5                  P R O C E E D I N G S

6          COURTROOM SECURITY OFFICER:  All rise.  United States

7  District Court for the Northern District of Georgia, Atlanta

8  Division, is now in session, the Honorable Judge Victoria

9  Marie Calvert presiding.

10         THE COURT:  Thank you.  Please be seated.  Good

11 afternoon.  We are here in Case No. 1:22-CR-283, United States

12 of America v. -- is it Glenn Laken?

13         MR. SAMUEL:  Correct, your Honor.

14         THE COURT:  All right.  And Christophe Merani?

15         MR. BORING:  Yes, your Honor.

16         THE COURT:  All right.  Can I have appearances from

17 counsel.

18         MR. KITCHENS:  Good afternoon, your Honor.  Nathan

19 Kitchens on behalf of the government.  I'm here with my

20 colleagues, Chris Huber and Tal Chaiken.

21         THE COURT:  All right.  Good afternoon to the three

22 of you.

23         MR. SAMUEL:  Your Honor, Don Samuel.  Don Samuel for

24 Glenn Laken, your Honor.

25         THE COURT:  All right.  Good afternoon.
```

1          MR. BORING:  Good afternoon.  Chuck Boring for
2    Christophe Merani with Joshua Mayes, co-counsel in the case.
3          THE COURT:  Good afternoon to all of you.  So we are
4    here on the motions to sever filed by both defendants, and I
5    thought that it would be helpful for me to hear from the
6    government about some of the factual questions that were
7    raised in Mr. Laken's reply brief, which were the same ones I
8    had.  So I really wanted to hear from you all.
9          MR. KITCHENS:  Of course, your Honor.  So let me
10   start, just to go directly there, with some of the factual
11   questions that were raised with Mr. Laken about the current
12   progress of things, and we can have argument.  Obviously happy
13   to answer any questions that the Court has.
14         Our overall view is that while I think Mr. Laken
15   noted the key question is when this would be able to proceed,
16   really the key question in terms of the law on this motion to
17   sever is a different one, which is have the defendants shown
18   compelling prejudice that would warrant a severance here.  We
19   think from our brief the answer is clearly no.  But I do think
20   the factual question is important for the Court's
21   understanding, the parties' understanding of how this is
22   likely to proceed.  So let me talk about some of those issues.
23         As the Court may know, there are six co-defendants in
24   this case with Mr. Laken and Mr. Merani.  All of them are
25   Canadian nationals.  They're not located in the United States.

1   Those defendants have a choice, and we've done everything we

2   can that we'll talk about in a minute to try to make sure that

3   they're aware of this choice.  But they have a choice.  They

4   can either choose to voluntarily appear in this district,

5   which point that would initiate the proceedings against them,

6   or they can wait until extradition proceedings go forward, and

7   we'll talk about that in a second as well.

8           Of course, the most efficient path for everyone, the

9   Court, government, certainly for the defendants that are here

10  today, is for those co-defendants to voluntarily appear, and

11  that's something that we think there are significant

12  advantages for all of us gathered here today but also for some

13  of those co-defendants if they chose to go down that path.

14          So we, you know, even trying to figure out the

15  logistics of that took some work on our end to make sure, for

16  example, if someone was to travel from Canada, are they going

17  to be able to cross the border, would they be arrested at some

18  sort of border stop or, you know, if they didn't travel into

19  Atlanta directly, is that going to cause a problem.  So there

20  were some logistical things we had to work out with Customs

21  and with FBI to try to figure out how that would work.  But as

22  the Court is aware, one of the defendants did that, and we'll

23  talk about that in a second as well.

24          The issue that we're trying to figure out is once we

25  actually reach a point of filing an extradition package, we

1   can't at that point have conversations with those defendants

2   that are subject to the extradition request about you could

3   voluntarily appear and choose that in lieu of going forward

4   and proceeding with your extradition proceedings.  Under

5   Canadian law and the way that they view those extradition

6   packages, it would be essentially considered to be potentially

7   a violation of the Canadian due process rights if somehow

8   there was a sense that we're making an offer, and they're, you

9   know, conditioning that offer on their willingness to forego

10   the extradition process.

11        So that all means that it's important as we've been

12   consulting with our Office of International Affairs at the

13   DOJ, which basically handles all the extradition requests for

14   the U.S. government, we've been consulting with them about the

15   best path forward.  And what they've advised is to try to get

16   clarity from each and every one of the defendants before we

17   file an extradition package so we know where everyone stands,

18   and we can figure out the defendants that will agree to

19   voluntarily appear and those that won't because certainly it

20   is the quickest and best path for everyone, we believe, if

21   they do agree to voluntarily appear.

22        So we've been going under and having conversations

23   with the co-defendants, or trying to.  So let me tell you

24   about where that currently stands and the results of that.

25   First, there are two of the co-defendants that have agreed to

1   voluntarily appear so that -- Dave Wong is one of them.   He

2   already appeared back in, I think, early June.   Breanne Wong

3   is his daughter.   She also has indicated that she would be

4   willing to voluntarily appear, would not need to go through

5   the extradition process.

6        There are two defendants who, based on our

7   conversations with them or counsel, have indicated that we

8   likely will need to go through with extradition proceedings.

9   So that would be Rahim Mohamed and Zoltan Nagy.   And that

10  leaves two defendants where it is still unclear where they

11  stand.   That is Richard Tang and Mr. Sewell.

12        So with Mr. Tang he just received, as the Court may

13  have noted, just received appointed counsel last week.   We

14  spoke briefly with counsel earlier this week.   At that point

15  she had not had an opportunity to even talk with the defendant

16  yet and she noted -- we discussed these options, gave her

17  things to think about.   She noted obviously she needs to talk

18  with her client and then will get back to us as soon as she

19  does.   So we have not heard back from her about, you know,

20  what was the outcome of that and whether's he's reached any

21  sort of decision.   So we just don't know.

22        The other defendant, Sewell, that's been kind of,

23  frankly, a little bit of a frustrating situation.   We have

24  been reaching out to his counsel for months to try to get some

25  clarity about that.   I think it's frustrating for them too

1  because the response we have been getting repeatedly from them

2  is that they're trying to clarify the status of their

3  representation.  I think defense counsel probably know as good

4  as me what that likely means.  But the most recent contact we

5  had with them, again, confirmed they're still trying to

6  clarify and get a sense of whether they're continuing to

7  represent Mr. Sewell, and if so, they would have this

8  discussion with him and figure out where he stands.  So we

9  have been pressing them to try to give us clarity one way or

10 other and then have those conversations.

11      If it looks like representation does fall through, at

12 that point we will obviously take steps to try to figure out

13 if there's a way that we can talk with him directly.  There's

14 limitations on that with Canadian law, but we did that with at

15 least one or two of the other co-defendants, and so we would

16 try to do that here just so we can get some clarity about

17 where he stands.  So we think it's important ultimately for us

18 to get that clarity and understand where Mr. Tang and

19 Mr. Sewell are and their preferences in terms of voluntary

20 surrender.

21      If they of course -- Mr. Tang, for example, he's

22 charged as a conspirator in each count in the indictment or,

23 you know, he's charged in each and every -- the substantive

24 counts as well he is a defendant in the indictment.  That

25 means if he chooses to really -- when he appears, it's going

1    to be very important in terms of how things could progress and

2    whether it makes sense to try to have a single trial with both

3    Mr. Laken and Mr. Merani and Mr. Wong or if there should be

4    separate trials for the LBTD scheme from the GMER scheme.  So

5    his decision is going to be important.

6         I think Mr. Merani also noted that, you know, he, of

7    course, has a close connection with Mr. Sewell, and the

8    conduct that is alleged against Mr. Merani also very closely

9    is intertwined with Mr. Sewell.  And logically there's going

10   to be a significant amount of overlap in the evidence

11   involving both Mr. Sewell and Mr. Merani.  OIA, Office of

12   International Affairs, has advised us again to try to get the

13   final response from those defendants in terms of where they

14   stand before we file the extradition package and go forward.

15   So that's what we're endeavoring to do as quickly as we can.

16   We're hopeful we'll hear from Mr. Tang soon.  And we'll keep

17   checking with Mr. Sewell's counsel, and hopefully we'll get

18   some responses there.

19        THE COURT:  Well, at what point would you decide that

20   you can't wait on Mr. Sewell to make his arrangements since

21   you've said you've been reaching out to him for months; right?

22        MR. KITCHENS:  Right, right.  I mean, I think that's

23   a fair question.  We haven't yet reached that point where we

24   think we just ultimately need to just assume that he's going

25   to require extradition, or whatever else, and just go through

1    the package and have it go from there.  Counsel have told us

2    at various points that they anticipate that situation will be

3    clarified soon.  It's obviously not as quick as we've wanted,

4    but we'll continue to check in with them.  And our hope would

5    be that's something that one way or other we'll have an answer

6    within a month in terms of where he's going to go, and then,

7    you know, we'll obviously try to make sure that we have an

8    understanding about his position on voluntarily surrender for

9    his extradition.

10         THE COURT:  And in terms of OIA, what have they told

11   you in terms of how long that process, the extradition

12   process, would take?

13         MR. KITCHENS:  So let me walk through all that, and

14   there's multiple different stages for how it could go.  And

15   not surprisingly a lot of this is ultimately kind of dependent

16   on how the defendant chooses to respond to an extradition

17   package.

18         Let me start at the beginning.  Once OIA submits the

19   extradition package, it goes to the state department which

20   sends in a diplomatic note that extradition package to their

21   counterparts over in Canada.  So that's a process that

22   recently -- OIA told me a couple days ago that that recently

23   has been taking about two or three weeks before the package is

24   actually sent to Canada.  Once that happens, basically their

25   equivalent of the Department of Justice, Justice Canada,

1    reviews the package to make sure that from their view it has

2    probable cause, meets the technical requirements that is

3    needed for the package.  They said that that process can take

4    a couple months before you would initiate court proceedings in

5    Canada and actually file it in court in Canada.

6            After it arrives in court, there's basically two

7    stages in terms of what happens.  First there's a preliminary

8    judicial stage, and this is pretty common and seems familiar

9    if you've ever gone through an extradition process in any

10   country.  But basically what happens is Canada, the Court will

11   review the evidence that's submitted, they try to make an

12   assessment.  Does the criminal offense that's charged, is that

13   something that is a crime under Canadian law, and, if so, is

14   there enough evidence that's presented in the extradition

15   package to support probable cause that an offense was

16   committed here.  And if so, it will go to the next step.

17           This is the part that's a little bit unique for

18   Canada, and before I get there let me just note, OIA, what

19   they told me is that process, that judicial review stage,

20   typically takes about six months.  Apparently, that varies a

21   little bit province to province, but that was their estimate

22   for roughly about how long it takes.

23           The next step is something that again is unique, at

24   least in my understanding to Canada, but it's a ministerial

25   stage.  And what that is is once you establish that there's a

1   crime and there's probable cause supporting that a crime was

2   committed, there's an opportunity then where Canada reviews if

3   there would be any violation of Canadian charter rights to

4   extradite the defendant.  So at that point sometimes they

5   noted it could be any sorts of arguments that a defendant may

6   bring up, but sometimes they may bring arguments about prison

7   conditions in the United States, if there is, you know, mental

8   issues, mental health issues or whatever else that a defendant

9   may be facing.

10          Sometimes there's issues about, you know, there's a

11  huge disparity in the potential sentences in the U.S. compared

12  to what the similar crimes, the sentences you would be facing

13  in Canada if you're charged with that.  So there's an

14  additional review at that point that can take place.  So that

15  process also, my understanding is, it can take a few months

16  for that process to go through.  It depends, the nature of the

17  arguments that a defendant raises.  Several defendants -- some

18  defendants don't raise any arguments at all, and that stage

19  can be fairly quick.

20          OIA noted that at any point of those proceedings --

21  and that's basically how it plays out before it gets to

22  appeal, and so there's a potential if it passes the

23  preliminary judicial stage, passes the ministerial stage, they

24  still have the right to an appeal.  And if so, they said that

25  that appeal generally takes about a year to work out.  So at

1   its longest it's something that could take, you know, two to
2   three years if some defendant tries to be as slow as possible
3   in trying to delay and hinder the extradition process as much
4   as possible.
5           OIA noted that there are many ways that truncate that
6   process, and this is something that, again, it depends on the
7   defendant.  But at any point in those proceedings the
8   defendant could choose to take a couple steps that would
9   greatly expedite how quickly they would be sent to the United
10  States.  First, they could decide at any point to waive
11  extradition.  What that means is they would basically -- by
12  waiving extradition they wouldn't go through the process at
13  all.  They would at that point be sent -- OIA said generally
14  they would come to the U.S. within three weeks of the package
15  being submitted to court.
16          The other alternative is they could, instead of
17  waiving extradition, they could consent to extradition so
18  essentially just say we, you know, agree, we're not going to
19  contest it.  They said that that process generally appears to
20  take roughly about three months or so where that process would
21  happen.
22          So, I mean, I think ultimately we agree, and this is
23  something, I think, both defendants noted at this point it's
24  unclear.  We don't know how long that process will take with
25  at least the two defendants who have indicated that, you know,

1  we would need to extradite them.  It's something that could be
2  very short.  It's something that could take a prolonged
3  process.

4        If it's short, then obviously we're talking about
5  something where, you know -- and we can talk again about, I
6  think, the legal question about the showing of compelling
7  prejudice and actual prejudice as well.  But it's all the more
8  reason, given that uncertainty, not to sever at this stage
9  because there's at least that possibility that the two, even
10  the two defendants who indicated they want extradition, where
11  it could be a very quick process where they're in the United
12  States after really not much delay.

13        On the other hand, if co-defendants indicate that
14  they're inclined to delay the proceedings as much as possible
15  to have prolonged challenges and then ultimately appeal and
16  stretch things out as long as possible, then obviously we
17  recognize we're dealing with a very different situation at
18  that point.

19        Mr. Mohamed, I think, is important.  He's been
20  charged in every count in the indictment.  Mr. Nagy is someone
21  who has only been charged as participating in the LBTD scheme,
22  but that certainly, I think, changes the calculus for us, for
23  the defendants, and the Court if it's something where either
24  of those two defendants indicates they want to string it out
25  as long as possible.  We recognize that really does change the

1   situation, but we're not there yet.  And we're in a situation

2   where looking at the actual showing that's been made by

3   Mr. Merani and Mr. Laken show that they cannot meet their

4   burden at this point of showing compelling prejudice that

5   would make this an exceptional circumstance justifying

6   severance.

7           So I don't know if I can talk about the prejudice

8   argument.  I don't know if there's any further questions about

9   the extradition process before I move there.

10          THE COURT:  Tell me about -- I think you said Breanne

11  Wong is intending to appear, but have you done -- received

12  more specifics about when?

13          MR. KITCHENS:  No.  You know, I think we need to talk

14  with counsel again to figure out kind of how it makes sense

15  for that to proceed.  But counsel did indicate she would not

16  go through the extradition process, she would voluntarily

17  appear.  It's similar to her father.

18          THE COURT:  And while the people in Canada are going

19  through the extradition process, are they out living freely in

20  Canada?

21          MR. KITCHENS:  Yes.  That's what OIA told us, is

22  given the nature of this case, it certainly would be

23  potentially different if you're dealing with a violent

24  offense, something like that, but with a fraud offense they

25  would be out on bail and they would be out through that

1   process.

2          THE COURT:  I think that's all I have in terms of --

3   well, I guess the one question is, it sounds to me like the

4   government's position is we just have to wait and see what

5   happens with these specific individuals as opposed to wanting

6   to provide a bright line, hey, if this went on for another

7   year, then we would agree to sever the trials; is that right?

8          MR. KITCHENS:  That's right.  I mean, I think the

9   right outcome given that the defendants can't show actual

10  prejudice at this point for compelling prejudice would be to

11  dismiss the motion to sever without prejudice, obviously for

12  them to refile.

13         If there were obviously changed circumstances, either

14  in terms of the timeline for extradition or in terms of any

15  sort of showing from the defendants or discussion with them

16  about we really are suffering at this point, tangible

17  prejudice or, you know, we're losing a potential defense if we

18  don't go forward with a trial, then that could obviously

19  change the analysis.  And at that point I think that's a very

20  different picture than what the Court is currently facing,

21  which is at this point general and conclusory allegations of

22  prejudice which primarily boil down to claims of anxiety and

23  fading memories from witnesses that any defendant would raise

24  in a multi-defendant trial.  And that is really all that the

25  defendants have presented in terms of a showing of prejudice

1   in this case.

2          I think when you look at that, you can see that again

3   there's really -- there's no dispute among the parties that

4   the general rule is that defendants who are indicted together

5   should be tried together, and there's also no dispute about

6   the legal standard that applies to a motion at this point,

7   that they bear a heavy burden to try to establish that

8   compelling prejudice, which means they need to show actual not

9   speculative prejudice, and they have to show that there's no

10  alternative to severance.  And the reason for that is that

11  it's very common in multi-defendant cases that the defendants

12  are proceeding on different tracks in terms of the timing of

13  that and how it goes forward.

14          That I would say is more common than the alternative

15  where everyone is on exactly the same timeline.  This happens

16  frequently when obviously you may have a multi-defendant case,

17  and one defendant files motions that may require a hearing,

18  may require extensive consideration by the Court, and the

19  other defendant doesn't.

20          Ms. Chaiken and I, actually, we have a

21  multi-defendant case that was indicted in the middle of 2020.

22  One of the defendants never filed a substantive motion.  Her

23  case is just being set for trial for early next year so nearly

24  four years later because, you know, there were multiple other

25  defendants that we had to sort through their motions and that

1   whole process before, you know, they were able to have a trial

2   date.

3         In some sense, you know, we're already on a little

4   different timeline with obviously Dave Wong appeared in June

5   so several months after Mr. Merani and Mr. Laken.  His

6   pretrial conference is scheduled for next month.  That's very

7   common that things like that will happen.  Mr. Merani's reply

8   brief makes no mention about, you know, Mr. Wong's appearance

9   and how that may or may not change their views on things, but

10  they indicated in their initial brief that they wanted to be

11  severed from non-appearing defendants.  So it seems -- and

12  they can certainly clarify -- that they recognize that

13  Mr. Wong would be tried with Mr. Merani, and he hasn't had his

14  pretrial conference yet at this point.

15        Another situation where obviously you get people on

16  different tracks is a situation that's similar to here where,

17  you know, you may have defendants that are arrested later, and

18  then they appear for the first time later.  But you also have

19  circumstances where, you know, I would say it's very common

20  where if you're trying to set a trial in a multi-defendant

21  case, where maybe one of the defense counsel has a conflict,

22  and that causes the trial to be pushed off for everyone.

23  That's something that just happens, and I think the law

24  recognizes that.  And that's where the standard is so high for

25  the defendants to show compelling prejudice to justify

1  severance.

2       What we have here is, again, just a generalized claim

3  of anxiety and a generalized claim of memory loss from various

4  victims.  I would say there's a couple of exceptions with

5  Mr. Merani that I can address as well.  But that generalized

6  claim of anxiety, as we note in our brief that the Eleventh

7  Circuit has already recognized, that's not sufficient under

8  *Avalos* and *Hayes*.  For Mr. Laken that's really the only

9  allegation of prejudice that he makes is, you know, he has

10 this hanging over his head, and so that presents prejudice.

11      There's no medical evidence provided about anxiety or

12 any sort of severe symptoms or anything like that that is, you

13 know, being experienced by the defendants.  But I don't mean

14 to minimize the importance of a defendant facing anxiety.  I

15 certainly understand if you have federal charges hanging over

16 your head, that that's not a pleasant experience, and you want

17 to try to resolve that and get clarity as soon as you can.

18      It's also true that every defendant to some degree

19 faces that exact same anxiety, and that's why this case is not

20 outside the heartland of cases where courts recognize,

21 particularly in conspiracy cases, that defendants should be

22 tried together even with that anxiety hanging over their head.

23 That's not sufficient to establish compelling prejudice.

24      There's also a generalized claim from Mr. Merani

25 that, you know, memory fades from witnesses.  He points a

1  little bit more specifically and says, you know, my own

2  memory -- as a defendant my own memory of conversations has

3  faded.  Again, every defendant can to varying degrees raise

4  the exact same argument, and that's why I think the Courts

5  recognize in *Avalos* and *Hayes* that that's not sufficient to

6  support compelling prejudice.  There's one witness that

7  specifically was pointed to, I think in *Avalos*, and noted that

8  the witness is losing her memory, and the Court said that's

9  not enough.

10         I think particularly here, as we note, Mr. Merani

11 points to actual documentary evidence that he says is going to

12 be critical to his defense where that's not going to fade over

13 time.  The documentary evidence is what it is, you know, and

14 there's just going to be a dispute between the parties about

15 whether it's inculpatory or exculpatory.  That's not

16 sufficient under the case law.

17         There are a couple of grounds that we do think

18 Mr. Merani raises that are specific to him, as we noted and

19 addressed in our brief, and that really all hinges on the fact

20 that as part of his conditions of release Mr. Merani had to

21 surrender his passport.  As the Court knows, that itself is a

22 fairly routine condition for defendants who are placed on

23 pretrial release and released on bond, and there's good

24 reasons obviously for that.

25         But also as the Court probably knows, both the

1  government and the magistrates in this district are, I think,

2  very understanding and flexible when there's kind of a

3  specific need shown to have the return of the passport on a

4  temporary basis.  I know that I personally have not opposed

5  and talked with defense counsel about making sure that a

6  passport could be returned on a temporary basis to renew the

7  passport or if there's some sort of urgent work trip that

8  needed to be done.  And the Court has granted that and allowed

9  the defendants to have the passport back for a period of time.

10  They do whatever business is required and then return the

11  passport to Probation.  I think the same thing could happen

12  here.

13       I haven't had an opportunity to talk with, you know,

14  Mr. Merani's counsel.  I'm not aware if they've checked with

15  Probation.  They, of course, haven't sought relief from the

16  Court, but it seems, as I understand it, they need the

17  passport to apply for a pilot license and want an opportunity

18  to travel to see family in Canada.  Those seem like things

19  that we can work out in talking with them, to seek a

20  modification to allow a temporary return of the passport, and

21  that's something we've done in other cases.

22       So that's something again where their showing needs

23  to be that it's compelling and prejudice where the only

24  possible remedy is severance, and I don't think that's the

25  case.  They can't make that showing when they haven't tried to

1    address and remedy that issue with the passport by talking

2    with us, talking with Probation, or talking with the Court.

3           The cases themselves, I think -- and if there are any

4    questions, I can certainly go into it, but the ones that they

5    cite noting where the compelling prejudice was established are

6    starkly different from here.  Again, as we note, each of those

7    cases that Mr. Merani cites in his opening brief were

8    situations where a defendant was in pretrial custody.  That,

9    the Supreme Court noted in *Barker*, was a significant

10   consideration because you're talking about defendants that

11   lost contact with their family, they have lost their entire

12   livelihoods, they can't work, and they're actually losing

13   their ability -- to some degree they're at least hampered in

14   their ability to present their own defense while they're being

15   in pretrial custody.

16          All of those things are significant factors, so it's

17   not that, you know, we're suggesting you need to be in

18   pretrial custody in order to establish compelling prejudice,

19   but that is a significant factor under the case law.  I think

20   one of the cases -- I think it was the *George* case -- the

21   defendant was in pretrial custody for 24 months by the time

22   that the Court granted the motion to sever, so there is

23   actually even a year earlier than that.  So the defendant had

24   been in pretrial custody for a full year.

25          The Court denied the initial motion for severance,

1  and it was at the point where the defendant had been locked up

2  for two years pretrial and was facing another ten months so

3  would have been locked up for 34 months because his

4  co-defendants were all facing capital murder charges when he

5  was not.  The Court drew the line at that point and said, you

6  know what, that is compelling prejudice at this point, the

7  second go round.

8          Another factor, I think, in those cases that you see

9  is where the defendants have actually lost potential

10 defendants or would lose them if there had been a delay

11 waiting for a joint trial rather than going forward and

12 proceeding with an individual trial.  So, for example, in *Baca*

13 a key defense witness that would provide exculpatory testimony

14 was diagnosed with cancer, and the Court noted that's a

15 significant consideration.  If we have a delay in trial, I'm

16 not sure if this witness is going to be available.

17         In *Cobb* there was no possibility that a joint

18 trial -- it was a situation where there are two brothers that

19 were charged, and one of the brothers indicated he would have

20 testified in his brother's defense and would have exculpated

21 him if they had separate trials.  And the Eleventh Circuit

22 said by doing this joint trial, this defendant was clearly

23 prejudiced because he didn't have an opportunity to present

24 this key exculpatory testimony, so that, of course, provided

25 prejudice.

```
1        Then there's other cases that I think are just,
2   frankly, unusual.  There's the *Rangel-Rubio* case where
3   actually that's a situation where it's the government that
4   applied for severance because they received a finding from the
5   Court that *Bruton* prevented them from presenting various
6   statements against defendants, and so they in response filed a
7   motion to sever saying we want to try these defendants
8   separately so we can then bring in that evidence and cure the
9   *Bruton* problem.  And so they granted it in that situation.
10       *Thomas* was a case where a defendant was seven and a
11  half months pregnant, were five days it out for trial when the
12  government moved for a continuance of the trial date based on
13  something that they knew for months, that there were several
14  defendants that were still going through extradition.
15       So I think the only thing that really kind of comes
16  out a little bit new with Mr. Merani is something that he
17  raises as a ground for prejudice for the first time in his
18  reply brief, and this is a claim that a joint trial would
19  prevent the jury from making a reliable judgment about his
20  guilt or innocence.  Because that was raised in Mr. Merani's
21  reply brief for the first time, we didn't have a chance to
22  address that in briefing.  If it obviously would be helpful to
23  the Court for us to have a surreply limited to that narrow
24  issue, we'd be happy to do that, but I can talk a little bit
25  about some of the relevant law that applies to that claim.
```

1        The general standard is laid out in that *Lopez* case

2    that we cite in our briefing, the Eleventh Circuit case where

3    it notes that the bar for showing prejudice based on a jury's

4    alleged inability to reach a reliable verdict is, quote, so

5    high that only in the rarest case can a defendant clear it.

6    That's on page 1235 of that opinion.

7        Mr. Merani raises two arguments for why he says a

8    jury couldn't make a reliable verdict in a joint trial here.

9    First he says that there are, quote, widely varying degrees of

10   culpability between him and the defendants, which means that a

11   jury would be unable to reach a reliable verdict.  That, of

12   course, that there are different degrees of culpability among

13   defendants is true of almost every conspiracy, but the

14   Eleventh Circuit is clear that joint trials -- and again this

15   is *Lopez* -- are especially important in cases that charge a

16   conspiracy.

17       The *Acosta* case that is cited by Mr. Samuel, also it

18   cites the Eleventh Circuit opinion in *Blankenship* that

19   discusses some of the standards here, and it notes only in,

20   quote, extremely narrow ranges of cases, unquote, where

21   there's different culpability and different standards of proof

22   among the defendants would -- where it makes it, quote, nearly

23   impossible for a jury to juggle everything properly and assess

24   the guilt or innocence of each defendant independently.  Only

25   in those circumstances, that narrow range, would that be

1    sufficient to show compelling prejudice and justify severance.

2    And *Acosta* cites numerous Eleventh Circuit opinions that

3    denied severance on this exact same argument.

4         Some of the cases that I think, you know, that do

5    discuss this, *Santiago-Mesinas* and *Baca*, are cases where there

6    was kind of this showing or at least an argument about the

7    jury being unable to reach a reliable verdict.  In both of

8    those cases the defendants were charged with one criminal act,

9    one overt act, and the co-defendants were facing dozens or in

10   the case of *Baca* hundreds of overt acts.  And the Court

11   said -- and this was in conjunction with the fact that those

12   defendants were held in pretrial custody -- said with those

13   two things together you're really dealing with a potential

14   issue when these defendants are just facing charges relating

15   to one offense instead of an overarching conspiracy involving

16   dozens or hundreds of acts.

17        Here Mr. Merani is charged in one of two schemes, and

18   he's charged in roughly half the counts in the indictment.

19   Based on that, he can't show that it would be nearly

20   impossible for a jury to assess his guilt in a joint trial,

21   particularly if a limiting instruction is provided to the

22   jury.  And I'll talk about that in a minute.

23        The second thing that Mr. Merani cites are the

24   extreme differences that he claims between admissible and

25   relevant evidence as to Mr. Merani and as to the

co-defendants.  I'll just focus on the evidence about LBTD

here and just at a high level note that I think it's unclear

what he means in terms of there being extreme difference in

culpability because for any of those defendants charged with

the LBTD scheme, we would have to establish that the market

and the trading for LBTD stock was manipulated.

That means if Mr. Merani were tried solo or if

Mr. Merani were tried just with Mr. Wong or if Mr. Merani were

tried with multiple defendants, we would have to show evidence

and testimony regarding the co-conspirators' control of that

stock and their efforts to conceal it.  We would have to

provide evidence and testimony from brokers and investor

victims about how their accounts were compromised and they

were then forced to trade and purchase LBTD stock.

Then we would have to show evidence from financial

records showing the distribution of proceeds from the sales of

LBTD stock after those account takeover attacks happened.  All

of that directly relates to the conspiracy that Mr. Merani is

charged with, and we would have to show that whether he's

tried individually or whether he's tried with all the other

defendants.

If there were a separate trial for Mr. Merani, that

means we would have to duplicate that same evidence for the

other defendants that are facing charges relating from the

LBTD scheme.  That means for some of those investor victims,

1   some of which are elderly, they would potentially be required

2   to travel to this district and testify multiple times based on

3   that severance.  So there's clearly an interest here in not

4   only judicial economy but also efficiency for the victims and

5   for the evidence of having this as much as possible then

6   minimizing the amount of separate trials that we have with the

7   number of defendants.

8        The Eleventh Circuit, again extremely clear here that

9   this is a very difficult standard to reach and one that

10   Mr. Merani cannot satisfy.  And the *Schlei* case that we cite

11   for the Eleventh Circuit, it notes that even if there's a,

12   quote, enormous disparity, unquote, in the evidence admissible

13   against the defendant and his co-defendants, that's not

14   sufficient to justify and trigger a severance.  And I think in

15   the *Lopez* case itself, just to give an example, the defendant

16   in that case made an argument that his co-defendants were

17   charged with a murder that he wasn't charged of participating

18   in at all.  And the Eleventh Circuit said, even though all

19   this evidence came in about a murder, that's not sufficient to

20   justify a severance in this case.

21        All of this is cured, even if there was a concern

22   about either of those factors, by the fact that the Court

23   could apply a limiting instruction, and that again is very

24   clear, both in the Supreme Court in the *Zafiro* case -- it

25   noted that limiting instructions, quote, often will suffice to

1   cure any risk of prejudice -- and in the *Schlei* case it looked

2   at a case where, again, I think the pattern instruction in

3   that case -- because there's Eleventh Circuit pattern

4   instruction B10.4 where it notes that the jury should consider

5   evidence against each defendant individually.  And the *Schlei*

6   case said providing that limiting instruction to the jury

7   avoided any potential prejudice in the case.

8          The jury, of course, is presumed to follow the

9   Court's instructions in any case, and that pattern jury

10  instruction makes it impossible for Mr. Merani to show that

11  the alternative -- that there's no alternative to severance to

12  cure any prejudice he would face.  That limiting instruction,

13  as the *Schlei* case noted, would cure any potential prejudice

14  based on any disparities and culpability or the evidence that

15  would be presented against Mr. Merani.

16         So overall there's not a showing by either of the

17  defendants of any actual prejudice, much less the compelling

18  prejudice that's required and their clear interest, just as

19  the Eleventh Circuit has repeatedly recognized, in trying the

20  defendants charged in conspiracies together, not only in terms

21  of judicial economy but also fairness and efficiency for the

22  victims and also trying to avoid inconsistent verdicts with

23  the jury.

24         As the Supreme Court has noted, the *George* case

25  that's cited in the briefs cites a Supreme Court opinion in

1    *Buchanan v. Kentucky* where it noted that joint trials enable a

2    jury to obtain a more complete view of all the acts underlying

3    the charges, which thus allows the jury to arrive more

4    reliably at its conclusions regarding the guilt or innocence

5    of a particular defendant.  We think that's true here as well.

6    It would most serve these defendants themselves if the jury

7    has an opportunity to get that complete picture involving all

8    the different defendants.

9           So I think that's -- we do not think they can meet

10   their burden at this point, that heavy burden, to establish

11   compelling prejudice, and that motion at this point should be

12   denied without prejudice obviously with the understanding that

13   if circumstances change in terms of that timeline for

14   extradition or in terms of any actual prejudice that is

15   experienced by Mr. Merani or Mr. Laken, we can revisit this

16   issue down the road.

17          THE COURT:  Thank you.  Mr. Boring or Mr. Samuel.

18          MR. SAMUEL:  I'll go first.  Age and beauty go first.

19   Your Honor, I'll be brief.  I know Mr. Boring has got a lot

20   more substantial information.  Let me begin by pointing out

21   that our major concern is the future delay.  We have been in

22   this case now for just under a year.  I think 11 months is

23   when I filed my notice of appearance.  He was indicted

24   sometime before that.

25          I was somewhat surprised to learn last week when I

1  met with Mr. Kitchens and he affirmed today, they haven't

2  started the extradition process.  I just kind of assumed that

3  when the arrest warrants are issued, that the Royal Canadian

4  Mounted Police or whatever in Canada arrests the defendant and

5  at least start the process.  And I'm surprised to hear that

6  here we are 12 months later, and it's like I don't know, I

7  guess we'll find out.

8          You know, even though this is all in the posture of a

9  severance motion, it's really -- the whole point is a *Barker*

10 *v. Wingo* kind of analysis of how long does Mr. Laken, who's 69

11 years old, have to wait to put this behind him?  So that's

12 why, you know, I didn't respond with a long set of issues as

13 Mr. Merani did, because I just want to know the answer to that

14 question, and I don't feel very comfortable that we know the

15 answer today.

16         It's been a year, and the government, as far as I can

17 tell, has done nothing, maybe reached out, tried to find some

18 lawyers or something.  That doesn't give me much comfort that

19 the government takes the case particularly seriously.  I

20 understand there are problems with international issues and

21 that Mr. Kitchens can't call someone in Vancouver or call the

22 place up there, but a year of non-motion seems somewhat

23 startling to me if the government had any interest in pursuing

24 this case, you know, with some speed as opposed to we'll get

25 to it when we get to it.  You know, Mr. Kitchens may be my age

1   before -- at the rate we're going at this point.

2           So that's my first observation, is I'm disappointed.

3   I was positive when I filed my reply brief, that I was going

4   to hear we're halfway through extradition, they've already

5   been through the ministerial stage, the appeal is about -- I

6   couldn't believe that nothing yet has happened in Canada, so I

7   would ask you to consider that.  And, again, I think, I think

8   you ought to think of *Barker v. Wingo* as opposed to the

9   severance cases because that's why we are asking for

10  severance, is so we can get moving.

11          I assume you know they're two completely separate

12  cases here.  They put it, you know, in one indictment, and we

13  are just in the second case.  We are in the second conspiracy.

14  There are, you know, four defendants in that conspiracy.  One

15  is dead, Mr. Cox.  I know Mr. Boring will mention that, that

16  it turns out he was dead long before the indictment.  I didn't

17  mean to steal that.  I know you were looking forward to

18  revealing that.

19          MR. BORING:  It is in writing.

20          THE COURT:  It's in the brief.

21          MR. SAMUEL:  It's in the brief, right.  That came as

22  somewhat of a surprise, though, as we were waiting to hear

23  about his status, and the next thing you know Mr. Kitchens

24  sends us a death certificate from years ago.

25          So Mr. Mohamed apparently is definitely going to be

1   asking for -- if you look at Count 9 on page 18 of the

2   indictment, Mr. Mohamed is apparently definitely seeking

3   extradition.  So at least according to the government's

4   version, we're two years away, I mean, best case scenario --

5   and I'll talk about that a little more in a minute --

6   conceivably two years away.

7          Mr. Tang is the interesting one.  Mr. Mohamed doesn't

8   know who Mr. Laken is, so he's neither here nor there for us.

9   But Mr. Tang is more interesting, but the problem with

10  Mr. Tang is, you know, two weeks ago we find out that he -- I

11  don't know what happened.  All I know is the Federal Defender

12  sent in a notice or the ECF has a notice that Caitlyn -- and

13  I'm sorry I don't know her last name -- is not his lawyer.

14         So I called her -- I sent her an email.  I said, is

15  he here?  Is he at Lovejoy?  There's no reason to have a

16  status conference with Judge Calvert if he's here.  That's the

17  end of our issue.  And she responded to me right away and

18  said, I've never even talked to the guy.  I have no idea

19  what's going on.  I have no idea why I was appointed, never

20  even seen the indictment in the case.  So that was a week ago.

21         So then yesterday I sent her another email, what's

22  going on, and essentially her answer was, I'm going out of

23  town, I'm not going to be there tomorrow, but then said

24  essentially what Mr. Kitchens said, which was, you know, I've

25  got to reach out to my client.  I've got to talk to him.

1  Well, I'm trying to picture what that conversation is going to

2  be like.  Well, Mr. Tang, I'm your new federal defender.  I've

3  just been appointed, and if you decide to voluntarily come

4  down here, I just want you to know that the government views

5  you as being the lead defendant in this case.  And so, you

6  know, in all likelihood you are looking at years and years in

7  prison for the amount of money, because he's in both cases.

8        He's very fortunate to have a very good judge who

9  will reward him for a 5K, I suppose down the road, but his

10  decision is going to be should I stay in Canada for two years

11  and enjoy my life or should I go to the United States, go to

12  Lovejoy, which is, as we all know, not the most pleasant place

13  to spend time, enter a guilty plea, and then hopefully I'll

14  get out in five or six -- I just am predicting that we're not

15  going to be hearing from Mr. Tang any time soon.

16        So having made that prediction, it sounds like we've

17  lost a year of nothing having happened.  By the way, five

18  years went between the events in the case -- four years went

19  from the events in the case until the indictment.  So before

20  they even indicted the case four years elapsed for our side of

21  the case.  Now we've added another year where nothing has

22  happened, so we're five years away from the events.

23        Then just adding up Mr. Kitchens' predictions, two to

24  three weeks, a couple of months, six months, three months, a

25  year, we're talking at least another two years.  That's just

1  when he arrives in the United States, and that assumes we're

2  going to start the trial the next day, which is unlikely

3  because then whatever federal defender is representing him at

4  that point is going to need another four, five, six months.

5  So we're talking about conceivably -- I'm making a prediction

6  here -- you know, three years from now.  That's what we're

7  talking about for Mr. Tang to arrive.

8           I'm not even talking about the other people in the

9  first conspiracy.  I have no idea who they are.  I don't know

10 any of those people.  Mr. Merani is not in our case.  The

11 other people aren't.  We know Mr. Mohamed is at least two or

12 three years away.  He's in both.  And Mr. Tang I am predicting

13 is going to fight extradition.

14          So under the *Barker v. Wingo* factors it's true we

15 have to show prejudice.  Mr. Laken is 69 years old.  The

16 government respectfully but not particularly respectfully says

17 who cares how much stress he's under.  Everybody is under

18 stress.  Fair enough.  I've talked to his psychiatrist.  I had

19 a long conversation with him on the phone.  I said, we don't

20 really need medical testimony at this point.  I don't think

21 you need to see that yet, and I'll tell you why.  But it's

22 probably more important than even losing a witness or two to

23 have to wake up every morning and say it's a beautiful day,

24 but I'm under indictment and look at your wife and look at

25 your kids and, you know, whatever.  It's just not -- I think

1  we all get so inured to this, you know, what's the big deal

2  you're under indictment.  So it's a burden, and we're talking

3  about, as I said, two and maybe three more years of this when

4  you're 69 years old.

5       So I'll get you the medical evidence if that's

6  something that you would find compelling.  I'll get it to you

7  anyway.  But his psychiatrist said he is in severe -- I don't

8  want to overstate it, but he's going through bouts of severe

9  depression about this.  So I want you to know that.

10       Here's my proposal to put it -- because all I'm doing

11  is predicting, and I don't think you could make a decision

12  based on Don Samuel's prediction.  I think the best course of

13  action would be set a trial date, January, February, okay, six

14  months from now for me.  I'm not talking about them, the first

15  case, the first conspiracy with Mr. Merani.  Set a trial date

16  of January or February when you've got time on your calendar,

17  Mr. Kitchens isn't in the middle of a trial, Mr. Huber is not

18  in the middle of a trial, and I'm finally finished with this

19  tax evasion case diagonally across the hall here.  Hopefully

20  it will be over by then.

21       And then let's have a status conference in 60 days.

22  Let's see where we are.  And if Mr. Tang has done what I'm

23  predicting, which is said I ain't coming anywhere, you know,

24  voluntarily to live in Lovejoy and then, you know, whatever,

25  if I'm right, let's go to trial in January or February and not

1  wait three years because the status -- we'll know the status

2  of Mr. Tang by then.  We already know the status of

3  Mr. Mohamed by then.  We know that already.  So the only thing

4  we're waiting for for my case is Mr. Tang.  It's August 4th.

5  Let's have a status conference early October and see if -- and

6  again I don't mean to call her Caitlyn, but I can't

7  remember -- I'm sorry I can't --

8          THE COURT:  Wade.

9          MR. SAMUEL:  Wade?  Right, right.  Let's see if she

10  can report to the Court or is willing to without waiving

11  privilege.  And if she says, no, you'll see me in two or three

12  years, we go to trial in January or February without him and

13  without Mohamed, and that's just the way it is.

14          If in October he says, he meaning Mr. Kitchens, says

15  I think we're close to a deal with Tang, he's going to come,

16  we've worked out -- and Ms. Wade confirms it but it's going to

17  take until March, we push the trial back to March.  At that

18  point I'd be hard pressed to say we're not going to wait

19  another day.  I won't do that.  I'll say if you're really

20  going to be -- you need another 30, 60 days, we're ready.

21  We'll be ready then, you know, with Mr. Tang.  But if he

22  hasn't even started extradition yet and she says he ain't

23  coming -- isn't coming, we all know it's going to be 2026 or

24  2027 at that point.

25          So that's my proposal.  Give us a trial date.

1   Everybody knows what the target is.  The government can't wait

2   another year to see what's going on, and Ms. Wade will report

3   to us at a status conference in October.  I think that's the

4   fairest thing to do.

5           THE COURT:  Thank you, Mr. Samuel.

6           MR. BORING:  Good afternoon, Judge.

7           THE COURT:  Good afternoon.

8           MR. BORING:  I have to say I was a bit surprised that

9   we are resting the decisions in this case, the path forward in

10  this case, the future of our client, Christophe Merani, on the

11  voluntary appearance of people the government themselves have

12  basically labeled criminal masterminds, fraudsters,

13  tricksters.  And we're supposed to trust that they're going to

14  just show up here and appear in court, and so we should all

15  wash our hands of it and go home.

16          I know I heard the term "common" used many times by

17  Mr. Kitchens.  This case is very uncommon for many reasons,

18  very uncommon, uncommon in that I'm sitting here as a criminal

19  defense attorney.  I spent 19 years as a prosecutor.  The past

20  3 years I was investigating judges and things of that nature

21  for the JQC.  And, of course, my luck would be the first

22  criminal defendant that I appear in court for is Mr. Merani

23  who, as anybody who's done criminal defense before, it's

24  horrifying when you have a client who is innocent and wants

25  their day in court.  And so this case is also uncommon I'm

1    sure, even though I've never been in federal court before,

2    it's uncommon in this courtroom for a criminal defendant who

3    is out on bond to come before you and say please let me go to

4    trial against the United States government.  Well, that's

5    exactly what we're doing for many reasons, and that's why we

6    think the most efficient way to handle this case for

7    Mr. Merani is to sever.

8          So Rule 14(a) exists for a reason.  It's not just

9    there for show.  It's not just there for anytime a motion for

10   severance is made it gets denied and put off for a year or two

11   to see what happens.  It is there for a reason.  It is to be

12   used in rare cases admittedly, but this is one of those rare

13   cases.  This case for Mr. Merani is the epitome of why, Judge,

14   you have the discretion to sever his case.  We're asking you

15   to exercise your discretion and sever his case.

16         Procedurally -- and I know Mr. Samuel has been a

17   little bit occupied for the last few weeks in a very

18   complicated -- made my head hurt when he was talking about it.

19   I really don't understand those things, and I was like, what

20   is he even talking about?  So I can only imagine what the jury

21   is enduring.  But this case is not five years to the day since

22   the allegations.  It's actually six.  This case was indicted

23   on the eve of the statute of limitations running.

24         The allegations that form the basis of this

25   indictment as to Christophe occurred in August and September

1   of 2017, almost six years ago.  For five years Christophe had

2   no idea that there was any kind of criminal scheme, much less

3   that there was any investigation, what little investigation

4   was done was ongoing, had no idea, no inkling.  And then five

5   years later on the eve of the statute of limitations running,

6   the U.S. Attorney's Office indicts nine people, including

7   Mr. Merani, in a sophisticated pump and dump scheme,

8   allegations of all kinds of complicated, complex, sinister --

9   and if you look at it and look at the indictment and look at

10  the discovery, there are some guilty people involved in this

11  case there ain't no doubt.

12          He is arrested without the police or without the law

13  enforcement, anyone ever even speaking to him, trying to get

14  records from him, trying to get anything from him.  He gets

15  indicted.  Obviously, this was August of 2022 when the

16  indictment was handed down.  Only two people were arrested and

17  appeared in court initially.  That was Mr. Merani and

18  Mr. Laken because they were both United States citizens.

19          I know I'm just finding out for the first time I

20  guess we've just been messing around for a year with the other

21  guys.  We don't have any proof of any type of effort other

22  than some phone calls about trying to get these defendants

23  back.

24          In October of 2022, this past October, discovery was

25  to be exchanged.  There was a pretrial conference.  It got

1  continued, and we'll talk about that in a minute.  As far as

2  why that was actually continued, the government is trying to

3  attribute that delay to the defense consenting to a

4  continuance.  That was actually the responsibility of the

5  government is why that got continued.

6         January there was a pretrial conference.  Mr. Laken's

7  case was continued.  We didn't object to it.  I'm going to

8  clarify something from the government's reply as we get into

9  it about what our position actually was on that because five

10 days later we filed a motion saying we were ready for trial.

11 And for the first time or for one of the first times,

12 actually, in writing in the court saying, hey, what's going on

13 with the extradition of all these other people?  What is

14 happening?  Signaling to the government that, hey, this is a

15 concern of ours, and we saw immediately there could be

16 constitutional problems on the horizon.  February 16th the

17 court certified Mr. Merani's case for trial.  Almost six

18 months later here we still sit in the same position.

19        Your Honor, as you know, Rule 14(a) gives you the

20 discretion to sever a case where there's prejudice to a

21 defendant or you may provide other relief required by justice.

22 I get three things from it.  I take three things from that

23 rule.  One, obviously there's the issue of prejudice to the

24 defendant which needs to be shown; two, discretion; and,

25 three, justice.  The only remedy in this case for Mr. Merani

1   that is just for anyone involved given the Court's actions and
2   inactions, is to sever his trial and not only let him
3   demonstrate to this Court and to a jury that not only can the
4   government not prove him guilty beyond a reasonable doubt, but
5   being one of those rare occasions where while there is no
6   burden, everyone will see that he is completely innocent of
7   what he has been charged with.

8          I'm going to start, of those three things, with
9   discretion.  Judge, basically what the law is is you have
10  complete discretion to do what you think is fair and just
11  based upon the facts presented to you under Rule 14(a).  On
12  *U.S. v. Cobb*, 185 F.3d 1193 -- that's a 1999 Eleventh Circuit
13  case I've cited in the brief, and I do have copies of the
14  cases, your Honor, for the government and you.  And feel free
15  to shred it, do whatever.  I've got one for the court reporter
16  too because we've talked earlier, we've met before.  She's
17  probably heard me talk real fast, and so she probably will
18  need to get spellings from the cases.  So I've got them there.

19         In the *Cobb* case that was a case that severance was
20  denied, and you actually had the Court get reversed by the
21  Eleventh Circuit for a failure to grant severance, just
22  showing you, your Honor, that you have the discretion.  It's
23  completely within your discretion to do what you think is
24  appropriate in this case, and we think starting with that
25  discretion, you start with that prism for which you look

1  through this to see what is right, what is sufficient for this

2  Court, what is right for Mr. Merani, and what is right for the

3  public in having resolution of the criminal cases.

4        The second thing we talked about -- and this is kind

5  of getting more into the argument portion -- legally and

6  factually is the prejudice angle.  They're basically -- the

7  way I think it's been presented in our reply brief through our

8  initial motion and today, two different issues of prejudice,

9  one being the delay.  And I know Mr. Samuel is right you

10 look -- I think it's good to view this case from the *Barker*

11 *Wingo* aspect looking forward and to see why it is this needs

12 to be severed so we don't get to a point where there is a

13 constitutional violation when it could have been averted and

14 Mr. Merani could have his day in court.

15       The second prong of this issue is going to be whether

16 Mr. Merani can actually get a fair trial and whether severance

17 is appropriate so that you have these issues of different

18 levels market different levels of culpability at play and

19 other factors that go into a necessitating and risking that

20 heightens the risk of prejudice which makes severance even

21 more appropriate in this situation.

22       Talking about delay, one thing is I know I've

23 mentioned, obviously, five-year delay between the allegations

24 and the indictment.  We're not saying that this is some due

25 process violation.  I'm sure your Honor is familiar that if we

1 were moving to dismiss this for some type of delay in

2 indictment, pre-indictment, that would have to be something --

3 a violation of due process because of the intentional acts of

4 the government to try to get a tactical advantage.  I think

5 this is the antithesis of an intentional act to gain an

6 advantage.  I think this was extreme negligence on part of the

7 government by waiting five years to indict this case and not

8 doing what they needed to do up to that point.

9 　　　　So I'm not saying this is intentional, but it is a

10 factor when you look at the delay and how it's compounded now

11 that there is an indictment.  We're not just talking about one

12 year these incidents just happened and now we're a year

13 further.  We're talking about when you're thinking about

14 memories and that type of thing, a six-year window.  In this

15 case we promptly notified the Court that we were ready for

16 trial, and we've maintained and asserted that right.  And

17 we've asserted our constitutional right to a speedy -- a trial

18 demand from the beginning.

19 　　　　I know I've cited the *Baca* case, the *Byrd* case.  I

20 know Mr. Kitchens talked about that a good bit.  Some of the

21 language in there talks about the fact that these cases were

22 severed because the delays may have not just been months but

23 possibly years.  In those cases a couple of those were because

24 there was a difference between a capital defendant and a

25 non-capital defendant, and thus, obviously, the capital

1  defendant is going to move much slower.  Here it's analogous

2  because you've got people that you have to extradite or people

3  that you don't.  And so you put these people in two different

4  categories here, and the impact is going to be as we've heard

5  from Mr. Kitchens himself.  This is going to be years for at

6  least a couple of the defendants to be brought back.

7       Mohamed and Nagy who are both involved in the

8  conspiracy that Mr. Merani is are actually -- they've said we

9  ain't coming.  Mr. Tang and Mr. Sewell, we've heard that the

10 government is frustrated with, you know, kind of Mr. Sewell

11 the check is in the mail, counsel, have we been retained, have

12 we not.  Mr. Tang has just gotten appointed counsel.  So all

13 that to say we have people that there is no doubt it is going

14 to be a lengthy process to bring these defendants back, if

15 they come back ever.

16      I know Mr. Kitchens talked about the *Hayes* case from

17 a speedy trial aspect and how that impacts it.  I would refer

18 your Honor to the *Heshelman* case.  I've included that in the

19 binder I gave you.  I believe it's a Sixth Circuit case from

20 2013, and that talks about due diligence on the part of the

21 government.  You've got cases where -- and I think in *Hayes* it

22 was attempting to extradite a defendant from the UK, if I

23 remember right -- through the UK from maybe Zimbabwe or

24 something like that where the process was a problem.  The

25 government was doing everything they could to bring these

1  people back.

2          In *Heshelman* the government took a wait and see

3  approach, and that's the terminology that the Court used in

4  that case, a wait and see approach.  Well, it sounds like

5  that's what the government did for a year.  They took a wait

6  and see approach.  Well, maybe these people will show up and

7  come hang out, and, you know, these fraudsters will decide

8  they want to go to prison.  That doesn't sound like the most

9  diligent avenue to make sure you ensure that everybody gets

10  their constitutionally provided speedy trial.

11          In the government's own brief they talk about that it

12  is a lengthy process to extradite.  In this case we now know

13  from talking with the government their best guess.  This isn't

14  a case of where this -- that this case is going to be delayed

15  for months.

16          If we're waiting for everybody in the first

17  conspiracy, in the Lotus conspiracy to be in this courtroom,

18  it's going to be years, and Mr. Merani who's come from Chicago

19  here today, 32 years old, no criminal history, he's an airline

20  mechanic who had never traded stocks in his life who just

21  happened to have brothers who were friends with Mr. Sewell.

22  And he's sitting here waiting to move on with the rest of his

23  life.

24          We're talking about the diligence, and you look at

25  the diligence of the government in this case.  And Mr. Samuel

1    was right.  I mean, it's no secret.  I am going to talk about

2    the fact that I think a telltale sign of this investigation

3    leading up to the indictment, Jeffrey Cox was indicted in this

4    case.  Jeffrey Cox died 18 months or 17 months before the

5    indictment.  The government did not realize and dismissed the

6    indictment until even further, eight months after that.  A

7    simple Google search of the words Jeffrey Cox Calgary, the

8    first thing that pops up is Mr. Cox's obituary, so we know

9    they had not bothered to try to even talk to Mr. Cox in this

10   investigation before indicting him.  They didn't bother to

11   simply do a Google search, and we know the federal government

12   and the FBI has a lot more sophisticated technology to try to

13   locate people and interrogation techniques, interview

14   techniques, information you would want to get if you're

15   accusing people of something so serious as is alleged in this

16   indictment.

17          I do want to clear up one thing.  I know in the brief

18   footnote -- and I think Mr. Kitchens mentioned it -- that we

19   had referred in the motion to sever that we wanted severance

20   from non-appearing co-defendants.  I just want to clear up.

21   We want severance from everybody.  In this case Mr. Laken

22   because like Mr. Samuel, they met for the first time here

23   today.  They don't know who each other is.  They're not even

24   involved in the same conspiracy.  The two people who are at

25   the top who are the only two involved in both conspiracies

1  aren't here and probably won't be here for years.  No, we want

2  severance from everybody.

3       We said non-appearing because the other defendants at

4  that time were non-appearing.  After we had filed that, then

5  Mr. Wong actually finally makes an appearance, so the filing

6  was before and prior to Mr. Wong actually being in custody.

7  So I just want to clarify that.  We do want severance because

8  now even when Mr. Wong -- he has no direct connection to

9  Mr. Merani.  He's now eight months, nine months behind

10  Mr. Merani in the process.

11      And so I know the government also pointed out in

12  their brief that the statutory speedy guidelines are -- it's

13  tolled.  It's tolled because they're seeking co-defendants and

14  bringing them in.  That's why we're bringing the

15  constitutional issues to you.  It's catch-22 for our client,

16  so, yes, we're going to toll it because we don't have anybody

17  but then you're just going to have to wait until then.  So

18  sorry no speedy trial.

19      One other thing just to clear up about that timeline

20  from August of indictment until now, as far as the delay, I

21  think the government tried to -- there was a line or two in

22  their brief about the defendant consenting to a continuance

23  back in October and pushing the pretrial conference a few

24  months.

25      If you look at the consent motion for why that was

1   done, that was done because right before, a few days before

2   the conference was supposed to happen we talked to the

3   government, and the government told us the discovery is going

4   to be about a terabyte.  When we found out later, like about

5   zero -- .001 percent of that actually involved Mr. Merani,

6   regardless at that point they couldn't even provide that to us

7   because it was their processing, data processing

8   establishment, that was having problems and kinks, so they

9   couldn't give it to us.  It was the government's problem that

10  caused that delay, so I just wanted to clarify that when

11  you're considering what has happened since the August

12  indictment.

13          So, again, I talked about the, you know, the

14  constitutional issue is on the horizon, and that's why we

15  flagged it.  And that's why we need severance, so we don't get

16  to that point.

17          One thing, I think Mr. Kitchens did admit to the

18  Court and he talked about the fact that it is not a

19  requirement that a defendant be in custody for there to be

20  prejudice.  I know there are several cases where defendants

21  are in custody.  And that is a factor, but that is not a

22  requirement.  That goes into your analysis.

23          So when we get into this, Judge, I do want to just --

24  it helped me kind of put together a little PowerPoint just

25  showing kind of the breakdown of the indictment and the

1 parties involved.  Hopefully, maybe it will help your Honor if
2 I can get this up.  Okay.  Can you see that, your Honor?
3         THE COURT:  I can.
4         MR. BORING:  Okay.  This is as low tech as our office
5 could come up with to give you -- we're not doing things
6 flying in in like, you know, high-tech animation in the
7 background.  I figure this is a pretty simple one to kind of
8 show the layout of these conspiracies and some players here.
9         So you see at the top you've got Mr. Mohamed and
10 Mr. Tang who are the criminal masterminds in this case, as
11 alleged in the indictment.  They are not here.  Mr. Nagy, who
12 was very involved in the Lotus conspiracy, involved in the --
13 Foremen, one of the corporations, and the movement of shares
14 early on, he is not here.  Mr. Wong, Davies Wong, he has how
15 availed himself with the court, but he's nine months behind.
16 And you see how he is disconnected from Mr. Merani.  In no way
17 is he connected to Mr. Merani.  You've got Breanne Wong who
18 we've heard now says she's going to come to the United States
19 voluntarily, but, again, the check is in the mail.
20         Then you've got Mr. Sewell who we've had issues with,
21 we heard that the government is having problems.  Mr. Sewell
22 is not here.  He is the only person that in any way connects
23 Mr. Merani to this case period, and from what we can tell, in
24 their investigation they never talked to Mr. Sewell.  In fact,
25 in this case not only do they not talk to Mr. Merani, they

1  didn't get any information from him and we turned over --
2  luckily for Mr. Merani, as fate would have it, thank God, he
3  still had the messages between he and Mr. Sewell.

4        Mr. Merani had an old phone.  He was thinking about
5  sending it in to get a hundred dollars off of the new phone.
6  He said, you know what, there are spam issues.  There are all
7  kinds of scams.  He threw it in a drawer not knowing that two
8  years later the very defense of his livelihood would be
9  sitting in that drawer.  He looked at his phone.  He didn't
10 have the messages and said, huh, let me go look at my old
11 phone.  Sure enough he found those messages.  We provided
12 those messages to the government, completely exculpatory,
13 completely showing he had no knowledge of any pump and dump
14 scheme.

15       It showed that Mr. Sewell, who was his older
16 brother's friend, he's like 30 years older than Mr. Merani.
17 They'd gone to church together.  He contacted him via the
18 internet and started talking to him -- they were talking back
19 and forth -- and asked him if he had ever invested.  And he
20 got Mr. Merani to open up a brokerage account here which
21 Mr. Merani let Mr. Sewell actually run, Mr. Sewell then
22 engaged with the Wongs and Nagy and all these people in this
23 criminal conspiracy.

24       In the midst of that, you'll see from the SEC -- I
25 don't think it alleges in the indictment, but the total amount

1   that the SEC -- in the government's best case they say how

2   Mr. Merani profited from this million dollar scheme $1500.

3   And the truth is we had the bank records to show and the

4   contemporaneous text messages to show he actually got ripped

5   off.  He is a victim in this case.  He lost $6,000 because of

6   Mr. Sewell, but we have Mr. Merani here as one of two people

7   sitting in this courtroom waiting for years to have their case

8   heard.

9           So when you talk about that, putting that context

10  about what the evidence is in this case, there are also phone

11  records about calls because Mr. Merani didn't just communicate

12  via text, he had talked to Mr. Sewell at times.  Now five

13  years later he is indicted.  Now six years later we are here

14  in court waiting for trial, and he's going to try to have to

15  remember the context of phone calls from that long ago that

16  the government never talked to him about, never asked him

17  about, and never contemporaneously or closer in time to when

18  this happened documented what was said back and forth between

19  these people.  We don't have it because they didn't bother.

20          During that time -- and we're not just talking about,

21  oh, it's a witness with fading memories like, okay, yeah, of

22  course, I don't know how many times I've made arguments about

23  it is natural for memories to fade after time.  That is how

24  the world works, but this is specifically a defendant.  And

25  the lapse in time has been caused by the government, and it's

1  going to continue for years now, if this case is not severed,

2  to impact Mr. Merani.  He was never called to the grand jury.

3  He was never told he was a subject or a target.  He was never

4  given a Wells Notice by the SEC.

5         This was so not common, as Mr. Kitchens said.  This

6  case is so uncommon that that's why we're here, and that's why

7  fading memories specific to Mr. Merani matter.  And in this

8  case I think it's important because as a prosecutor you deal

9  with very serious crimes and people's livelihood.  You are

10  taking people's freedom.  You have a duty to be a gatekeeper,

11  and I don't know how many times in training of the prosecutors

12  you tell them don't go in with blinders, you have to keep all

13  reasonable alternative hypotheses open, A, because you don't

14  want an innocent man to be charged but, B, to be able to

15  explain to a jury, okay, that is reasonable, why is that not

16  true?  99 times out of a hundred in my experience it was like,

17  okay, that's a reasonable alternative hypothesis, here is an

18  answer to it.  That wasn't explored here, and if they had

19  explored it, Mr. Merani would probably be on a witness list

20  and be seeking restitution from Mr. Sewell instead of now

21  having a federal indictment hanging over his head, having his

22  passport taken where he can't go get his pilot's license,

23  which is the next step in his career, where he can't go visit

24  his father in Canada who's in a retirement home, in an old

25  folks home.  Sorry to call it that, but it's what Mr. Merani

1 called it earlier.  He's put in this position for all those

2 reasons.

3          So the anxiety, the memory fading, these are specific

4 and due through no fault of Mr. Merani's but solely at the

5 feet of the government.  And they tell you now trust us, we're

6 working on it, we haven't done anything in a year, but now

7 we're going to do something.  And we're going to trust these

8 criminal masterminds to just come show up in court.

9          The *Hayes* case, I know the government cited and

10 talked about that case standing for the proposition and for,

11 you know, generally witnesses.  In that case it was one

12 witness they had that they used as an example who couldn't

13 remember specific details.  What they pointed out in that case

14 was they didn't remember specific material facts for the case.

15 It had to be material for it to make a difference.  Here this

16 is the defendant with material facts about the allegations for

17 what he is facing.

18          What you're faced with with this fading memories

19 issue is a catch-22 for Mr. Merani as well because of the

20 government's inaction.  He has this specific issue being the

21 defendant being very important, that, you know, he remembered

22 the context of these phone calls because there's no doubt the

23 government is going to say, okay, ignore all these text

24 messages which exculpate him.  They must have talked about a

25 criminal scheme in these phone calls.

1        Well, now we don't have those phone calls.  We don't

2   have a contemporaneous investigation or interview about those

3   phone calls, and you know what's going to happen.  Mr. Merani

4   is going to get on the stand, and he's going to say words like

5   I don't remember the context of that phone call, I don't

6   remember what we were talking about.

7        Some of these text messages, which Mr. Kitchens is

8   right, we have those.  We can still show those to a jury, but

9   there's also context in those that Mr. Merani six years later

10  may not be able to say you know what, on cross-examination,

11  Mr. Kitchens, I don't know what that meant.  The argument then

12  is going to be, you know what, Mr. Merani is saying he doesn't

13  remember.  He must be guilty.  He's obfuscating.  He's trying

14  to get out of it.  His memory fades when it's convenient.  So

15  now the very lack in memory that has been caused by the

16  government is going to be used as a sword against him during

17  cross-examination, and it can only get worse if this case goes

18  on without severance for Mr. Merani.

19        I know we've talked about anxiety a little bit.

20  Mr. Samuel did, and Mr. Kitchens did as well.  And there have

21  to be particular hardships as opposed to general cases that

22  every defendant goes through, every criminal defendant in the

23  system deals with.  They're much different in this case, and

24  I'm not going to beat a dead horse.  I mean I probably already

25  have a bit, but the nature of how this case went down is

1  anxiety.  Mr. Merani gets a call from the FBI in Chicago like,

2  hey, you need to turn yourself in tomorrow.  And then he comes

3  in, is arrested, goes for a bond hearing, gets his passport

4  taken, is under federal indictment for something he didn't

5  even know was going on at all.

6      This scheme painted in this indictment is serious

7  business, and you've heard even from the indictment you can

8  tell what his connection is, if anything minimal.  He's had

9  his passport taken.  His dad is in Canada.  He's cut off from

10 traveling to see him.  He can't get his pilot's license

11 because he doesn't have his passport, and he's under

12 indictment now.  So his passport is with them, and he can't

13 move faster with his career.

14     Now, the government argued that, well, you know, he

15 can always come back and ask for his passport.  Think about

16 the nightmare that this man has gone through, 26 years old is

17 when all this happened.  He was 31 last year when he was

18 arrested.  Young man born in Canada, working as an airline

19 mechanic in Illinois, gets arrested by the federal government

20 for a serious criminal scheme that he had no idea about where

21 evidently over a million dollars of losses happened to

22 investors, appears before a federal judge, United States

23 attorneys prosecutors, not knowing if he's going to end up

24 sitting in jail.  But you get out, and one of the conditions,

25 if we agree to this bond condition to let you out, is you have

1    to turn over your passport.

2           Do you really think that he's just going to say you

3    know what, I'm going to go back in there and ask for it back?

4    These were the government's restrictions and thought it

5    appropriate.  If it were inappropriate and these were

6    inappropriate restrictions for what Mr. Merani has done, they

7    should have just given it back.

8           The other prong aside from delay -- and I don't think

9    you can just separate them.  They work together in this case

10   because the totality of it is what necessitates a severance

11   via 14(a).  You also look -- if this case is not severed for a

12   serious risk that a joint trial will prevent a jury from

13   making reliable judgment of guilt or innocence.  I think

14   that's the -- I'm probably going to butcher the

15   pronunciation -- *Zafiro* case.  The Supreme Court of the United

16   States looked at several factors that talked about, you know,

17   what do you look at and what could constitute severance or the

18   necessity of severance in a case?  What would be the example

19   that you would look at?

20          They cited if you've got a case with many defendants.

21   Well, look at your screen.  Tried together, of course that is

22   the whole reason of waiting for everybody to get extradited,

23   so they can try them together.  In a complex case, I mean,

24   frankly -- you know, Mr. Mayes worked at the SEC.  When I sat

25   down and talked with him about this case, I understood why

1   Mr. Merani was not guilty of this, but all this other math and

2   trading and stuff, it had to be explained to me because I

3   didn't really understand it.  Imagine what a jury is going to

4   try to think trying to come to grasp with a pump and dump

5   scheme and other people's connections.  And market degrees of

6   culpability, you look at market degrees of culpability as well

7   could be a reason for severance.

8          We're not just talking about, oh, there's a lot of

9   evidence against one like you've got confession in the

10  videotape of the murder, you know, everybody ratted him out

11  and then one other person -- where a co-defendant was also

12  involved, but all the evidence is circumstantial.  That's not

13  what we're talking about.  We're talking about the level of

14  involvement, the level of culpability, even by the

15  government's own evidence before they were provided with the

16  exculpatory evidence that we have.  Okay.

17         So in their indictment they talk about the fact that

18  this scheme resulted in a loss of over $1 million.  The

19  government in their SEC filing says, well, in their best case

20  scenario before they were provided with the contrary evidence,

21  which is objective, bank statements, text messages, that he

22  was responsible and somehow received $1500 from this $1

23  million criminal scheme.  In actuality he lost $6,000.

24  There's no doubt the evidence will show that.  That

25  constitutes .0015 percent of the alleged loss in this case.

1  You look at the percentage of shares traded just via the longs

2  in this case.  7.5 million is what is noted in the indictment.

3       Christophe's account, and you'll notice -- look at

4  the indictment.  They can't even say Christophe did it.  They

5  say Christophe's account was used to do these things because

6  they know the IP address in this case comes back to

7  Mr. Sewell.  They know for a fact Mr. Merani was not operating

8  the brokerage accounts when this happened.  They knew for a

9  fact.  They indict Christophe's account for having traded

10 30,000 shares, again .004 percent of the shares involved in

11 this huge criminal scheme.

12       Then you look at the markedly different degrees of

13 culpability, all these criminal masterminds and all of this.

14 You've seen through the indictment, you know, the signing of,

15 like, forged paperwork, backdated paperwork, trading of funds

16 between this corporation, that corporation, offshore trading.

17 Mr. Merani opened up a brokerage and gave his password to

18 Mr. Sewell.  That's what we're working with here, an airline

19 mechanic outside of -- an hour outside of Chicago at 26 years

20 old with a 30-year-old man, a man 30 years his senior asking

21 him if he wants to get into trading.  And he'll show him how,

22 and then he conducts the trades.  There's not going to be any

23 dispute about that.  So there are markedly different degrees

24 of culpability.

25       You look at the complexity.  I know the government

1   has a terabyte that was disclosed, over a terabyte of

2   information minimally, minimally connected to Mr. Merani.

3   You've got -- as far as overlap, maybe if Mr. Sewell were here

4   there would at least be one person in this courtroom who even

5   knows Mr. Merani, and if they bothered to bring him in or had

6   bothered to talk to him, maybe they'd talk to him and said,

7   oh, yeah, they would know Mr. Merani didn't know what was

8   going on.

9          Then you've got to consider with all of these

10  different defendants, with all the different levels of

11  culpability, with all the different evidence the different

12  levels of inadmissible and admissible evidence.  But looking

13  at -- let's look at the *Lopez* factor cited by Mr. Kitchens,

14  which I think actually support Mr. Merani's case for

15  severance.  First, Lopez factor, reduce the risk of

16  inconsistent verdicts and unfairness of serial trials.

17         The differing levels of culpability, severance

18  actually ensures a consistent verdict with specific evidence

19  as to Mr. Merani versus others.  This is actually more fair if

20  it is severed.

21         Mr. Merani's testimony in no way, shape or form is

22  necessary or could involve or assist in proving the guilt of

23  the other defendants in this case period.  Nothing that he

24  could contribute, nothing against him is going to contribute

25  to the guilt of the other people involved in this case if you

1  sever it.

2       This case, while it is so complex with everything

3  else going on, for somebody like me luckily to defend

4  Mr. Merani it is very simple.  The defense is very simple.

5  Did he know this was a scheme that was going on or was he due?

6  Did he have the intent or not?  It's very simple.  I've talked

7  about, well, we believe the evidence shows from what we've

8  received from what's in the indictment and from what we've

9  provided, this is, frankly, Twilight Zone, where you've got

10 somebody in here, in this courtroom, that was actually the

11 victim of fraudsters facing a federal trial.

12      You know, talk about one of the other factors --

13 well, going back to that factor and it being simple, I know

14 Mr. Kitchens talked about a lot of, you know, we're going to

15 have to bring in -- which brings us, I'm sorry, to the next

16 factor under *Lopez*, lighten the burden on victims and

17 witnesses.  I was jumping ahead of myself.  This actually is

18 the next factor.  We're going to have to bring all the same

19 witnesses -- you know, we're not bluffing.  We're ready for

20 trial.

21      We're not contesting that there was a criminal scheme

22 or was not a criminal scheme.  We'll stipulate.  Sure all that

23 stuff happened.  Let's get it all down.  Let's get to brass

24 tacks.  Can you prove Mr. Merani was in on this scheme?

25 That's what this case is about for Mr. Merani.  So we're not

1  going to have to waste time by bringing all these other people

2  in if they brought them in.  Our cross-examination would be no

3  questions.  We'll -- if they want to testify via Zoom, fine,

4  whatever, because it is not relevant to Mr. Merani's defense.

5  So it's not going to be a burden on victims and witnesses.

6         I think this trial may last two days for Mr. Merani.

7  I can only imagine, you know, the main witness will be the

8  investigator who did or did not do many things in this case

9  over the course of five years before indictment, and he's

10  going to have to answer to those things.  That's going to be

11  the gist of the case.

12         The third factor, increase sufficiency and conserve

13  judicial resources.  We all know -- first of all you talk

14  about judicial resources, what it takes to try a

15  multi-defendant case these days, the security issues, the

16  logistical issues, the evidentiary nightmare of trying

17  numerous defendants when it's, frankly, unnecessary and we're

18  waiting for a couple of years.  We've got Mr. Merani.  Were he

19  and Mr. Laken just going to sit here and, you know, clog up

20  your calendar for two or three years while we wait?  There's a

21  duty to these defendants and the public to move the cases

22  efficiently.  To not do so and to not sever and try their

23  cases would not follow that.

24         I mean, you see these cases.  Like down the street

25  we've got multi-defendant cases that go on for like seven

1   months already, and they don't have a jury.  It would be more

2   efficient for a simple case like Mr. Merani's to be severed

3   and tried.  Severance would focus and advance this case.

4   Otherwise, it's just going to linger on your docket until

5   resolution.

6          I think it's clear.  We are not saying and not moving

7   to dismiss this case based upon it being a violation of

8   Mr. Merani's constitutional speedy trial rights.  What we're

9   arguing is that we're about to cross the Rubicon.  We're

10  almost at one year, which is presumptively prejudicial in

11  Mr. Merani's case and its indictment, almost one year already.

12  And what we get is, well, we're starting to call some people,

13  and hopefully they'll arrive.  And if they don't, it will be a

14  few years.

15         I don't think the appellate courts are going to look

16  kindly upon that on appeal when you look at a constitutional

17  violation, if this case is two, three, four years down the

18  road, and we've been asking for a trial since January.  I

19  think, you know, Mr. Samuel covered the *Barker Wingo* factors.

20  You've probably heard them a million times.  Everybody knows

21  what they are.  They're coming, and if we don't resolve this

22  case soon, they're going to be here.

23         Your Honor, we're asking you to sever because it's

24  the right thing to do, because you have the discretion, and

25  because you need to hold the government accountable.  If they

1   want to try -- if they wanted to charge Mr. Merani in the way
2   they did, they need to try him.  This mess is their making.
3   Five years, even though it's been investigated for years,
4   waited five years to indict it, over those years never talked
5   to Christophe, never sought the objective evidence that
6   existed from him, and if they had, it would have shown he was
7   a victim.  Instead, because of their actions and inactions, we
8   have serious fraudsters still free from accountability in
9   other countries, in another country with an innocent young man
10  facing federal charges while those who victimized him and
11  those who victimized numerous others for over a million
12  dollars continue hanging out, continue on.
13          Severance is the proper remedy, is the only proper
14  remedy in this case, and that is -- the other option is to
15  postpone trial indefinitely while the government crosses its
16  collective fingers in the hopes that numerous individuals who
17  they've charged as criminal fraudster masterminds, thieves of
18  a very sophisticated nature, crossing their fingers that they
19  voluntarily show up one day and say I'm here, please send me
20  to prison.  Thank you, your Honor.
21          THE COURT:  Thank you.  I need to give my court
22  reporter a break.  Y'all have been talking a lot, so let's
23  take a ten-minute break.
24          COURTROOM SECURITY OFFICER:  All rise.  Court is in
25  recess.

```
 1              (Brief recess.)
 2              COURTROOM SECURITY OFFICER:  All rise.  This
 3   honorable court is once again in session.
 4              THE COURT:  All right.  Mr. Kitchens, you were
 5   getting up for the last word.
 6              MR. KITCHENS:  Thank you, your Honor.  I think from
 7   hearing all of that from Mr. Merani and Mr. Laken, the key
 8   thing that it would come down to is the question that is left
 9   for the Court, which is have they carried their heavy burden
10   to show compelling prejudice in this case.  And it is clear
11   from hearing them, from hearing what they've said today and
12   any sort of authorities that they've pointed to, they cannot
13   point to any case where a Court found compelling prejudice for
14   a defendant who's out on bond based on generalized allegations
15   of anxiety, fading memories, or there being disparity in terms
16   of culpability.
17              These are not new arguments.  These are arguments
18   that have been squarely raised and addressed by the Eleventh
19   Circuit, which has repeatedly rejected these exact same
20   questions and these exact same concerns.  It soundly rejects
21   the only claims of prejudice that Mr. Laken and Mr. Merani
22   raise in this case.  While the Court, of course, does have
23   discretion in its reviews for abuse of discretion, granting
24   severance based on these circumstances and these facts would
25   be squarely contrary to that consistent Eleventh Circuit
```

1  authority favoring joint trials in cases of conspiracy and

2  that defendants who are indicted together should be tried

3  together.

4          A couple things just to correct.  I think -- and I

5  may have been confusing in terms of how I tried to lay out the

6  timeline in terms of extradition, but I think both Mr. Samuel

7  and Mr. Boring said at a minimum for Mr. Mohamed, for example,

8  who wants to go through extradition, that it would take him a

9  matter of years.  To be clear and just to note again, that's

10 not the case.

11         Again, there are options that a defendant has, and

12 this is why I don't know, OIA doesn't know, we don't know how

13 the case proceeds or at any point of extradition proceedings a

14 defendant can choose to waive extradition at which point from

15 when they indicate that, it would be a matter of, OIA

16 estimated, three weeks for them to appear in U.S. courts or

17 they could agree to consent to extradition, which point OIA

18 estimated would take about three months for a defendant to

19 arrive.

20         We don't know what Mr. Mohamed or any defendant who

21 was planning -- would plan to do once an extradition package

22 is filed, but it is not the case that because we have to file

23 an extradition package against Mr. Mohamed, that we're talking

24 it is going to take two to three years at a minimum to get a

25 defendant to appear here.  As we noted in the argument, if it

1   looks like the defendant is taking every step possible to try

2   to hinder the extradition proceedings or to string it out as

3   long as possible, then that's a circumstance where it makes

4   sense for us to reconvene and discuss again and figure out

5   what makes sense in terms of can we proceed without that

6   particular defendant.  Certainly recognize that.  At this

7   point it is entirely speculative how long that extradition

8   process is going to take as to that defendant, but it is

9   certainly not the case that it is a minimum of two years.

10           I know Mr. Merani raised for the first time and just

11  clarified for us, which is helpful, that he's seeking a

12  severance from Mr. Wong as well, again no real explanation for

13  a basis for severing it from Mr. Wong.  As we noted and as we

14  discussed during the argument, there would be significant

15  overlap in the evidence presented at a trial against Mr. Wong

16  and Mr. Merani.  Mr. Boring says he would stipulate that the

17  victims were harmed, that fraud happened, and then he really

18  just wants to focus on really the interaction with Mr. Sewell.

19           We obviously -- the government has the ability and

20  the right to present the case the best way we see fit, and we

21  think that the evidence that would be presented at a trial for

22  Mr. Merani separately or if he's jointly at -- with Mr. Wong,

23  would overlap significantly in terms of witnesses that would

24  have to be called and would have to appear.  And there is

25  significant inefficiency and burden placed on those victims as

1  well as a significant loss of judicial economy if the Court is

2  in a position where based on the defendants and what they've

3  requested, they would seek a separate trial apparently for

4  each and every one of the defendants that come in.

5         So this Court would have seven, eight different

6  trials potentially involving this one indictment.  That is

7  plainly, you know, inefficient and abusive of judicial

8  resources in addition to being grossly unfair to the victims

9  or witnesses who would have to testify multiple times based on

10  a finding of -- a complete lack of showing of prejudice, which

11  they need to show in order to justify severance.

12         There was, you know, a suggestion certainly made by

13  Mr. Boring that there was issues with the government's

14  diligence since this case was indicted.  Again, that is not a

15  factor in terms of really whether the Court should grant

16  severance or not.  It's just a question of have they met their

17  burden to show prejudice.  But even that and his suggestions

18  that all the government has been doing is waiting around and

19  keeping our fingers crossed and hoping that defendants will

20  just decide to voluntarily appear is not accurate.  It's far

21  from the reality of what's been going on.

22         The government has had repeated conversations with

23  defense counsel.  There are multiple -- one complicating

24  factor is there are multiple defendants who were pro se, and

25  then we had to figure out because they are in Canada what are

1   the laws that allow us to -- can we just reach out to a

2   Canadian citizen who is a pro se defendant?  Do we have to go

3   through special legal process to do that?  Then once we

4   received guidance and permission about what to do, then we're

5   able to contact those pro se defendants to try to have

6   conversations with them about what they want to do.

7           For those defendants who decided and had

8   conversations about voluntary surrender, it took multiple

9   steps and significant work by the case agent to try to figure

10  out what would be required logistically to do that.  There

11  were discussions with the Court about how would this work,

12  would the Court agree to grant bond in that situation, which

13  is, in fact, what happened with Mr. Wong.

14          I think there was a representation from Mr. Boring or

15  Mr. Samuel why in the world would a defendant agree to

16  voluntarily surrender.  One consideration, if you go through

17  extradition, you're extradited, you're going to be held in

18  custody pretrial.  You are going to be over at Lovejoy or USP

19  Atlanta.  You'll be held there pretrial.

20          Mr. Wong decided to voluntarily appear.  He's

21  currently back home in Canada out on bond.  That's a

22  consideration that defendants can make when they choose

23  whether to voluntary surrender or if they want to go through

24  extradition at risk of being held in pretrial detention.  All

25  of that took multiple steps to try to figure out what does he

1  want to do and then try to work out the logistics to make it

2  happen.

3         Then, of course, there's another issue that I could

4  mention with Mr. Tang that I think was hopefully resolved, but

5  we could address that.  I don't think it's relevant to the

6  Court's inquiry, but if the Court wants to know about that, we

7  could address it ex parte.  And then, of course, there's work

8  on the extradition package itself.  So once we do get clarity

9  from the defendants, we're in a position where we can go

10  forward and go through all the processes we talked about to

11  get that process rolling.

12         So there's been significant work from the government

13  just to try to figure out the statuses of these defendants.

14  It has not been let's sit and wait and see what happens.  We

15  have been diligently trying to pursue this and to try to get

16  things moving as expeditiously as possible, and it is in all

17  of our interests to get this case tried as quickly and as soon

18  as we can.

19         Obviously, the defendant's complaints about fading

20  memories, probably not limited just to the defendant himself.

21  We recognize it would affect government witnesses just as

22  well.  We also have an interest in trying to have this

23  prosecuted as efficiently and as quickly as possible but not

24  at a point where we are just leading to needless duplication

25  and waste of judicial resources and putting the victims in a

1   position where they're going to have to testify multiple

2   times.

3         Mr. Boring also wanted to address, apparently, and

4   have the Court seek, you know, the government -- excuse me --

5   the Court to assess basically the guilt or innocence of his

6   client and cites that as a basis for severance in this case.

7   Mr. Samuel didn't address this.  I assume Mr. Samuel would

8   also say his client is, of course, completely innocent, wants

9   his day in court.  I'm sure any defendant in a multi-defendant

10  trial seeking severance would make the same claim.  You know,

11  that is obviously not a consideration for the Court.  It's

12  inappropriate for, you know, the Court to do that.  It's not,

13  you know -- doesn't go to prejudice or anything like that that

14  they would need to show.

15        Just so it's clear, under the defendant's best case,

16  Mr. Merani's best case, as I understand it, the defense would

17  seek to establish that Mr. Merani lied to the broker-dealer

18  when he opened his account and intended to trade on behalf of

19  another person, that Mr. Merani then lied to the broker-dealer

20  repeatedly in a series of recorded phone conversations with

21  the broker-dealer regarding the specific trades charged in the

22  indictment, and that Mr. Merani corresponded with Phillip

23  Sewell about the specific trades charged in the indictment.

24        None of those things are facts, are things that the

25  Court needs to assess or needs to consider, and any sort of

1   claim of innocence is something that obviously the jury will

2   have an opportunity to find on its own.  But all of those

3   things suggest that there's not prejudice even under the

4   defendant's rosiest scenario when you're dealing with

5   Mr. Merani who under what they will present repeatedly lied to

6   a broker-dealer.

7          There's also the one specific area, again, that we

8   discussed in terms of prejudice was, you know, the issue with

9   the passport, and all I can say to Mr. Boring is we are happy

10  to have that conversation, even right after this hearing, to

11  discuss that and figure out what is needed for Mr. Merani to

12  seek his pilot's license, what kind of trip he would have in

13  mind with his family to see them.  They can talk with us, and

14  I imagine just as we have in the past, if it's a reasonable

15  request, we will make a reasonable suggestion that we would be

16  fully on board with them having a temporary return of the

17  passport.  So we can certainly start that conversation right

18  after this hearing.

19         That leaves us, I guess, with remedies, and I think,

20  again, based on the case law, it is very clear under Eleventh

21  Circuit law they have not met their heavy burden to show this

22  is an exceptional case where they've shown compelling

23  prejudice at this point.

24         So Mr. Samuel's suggestion said what the Court should

25  do is go ahead and set a trial date, and then let's have a

1  status hearing in 60 days.  Well, to what defendants would the

2  Court be setting a trial date?  If the Court -- if what

3  Mr. Samuel is suggesting is that the Court should set a trial

4  date just as to Mr. Laken, then at that point what he's

5  basically asking is the Court to go ahead and decide and sever

6  Mr. Laken to set a trial date.  And so we would just skip over

7  the whole prejudice thing.  Let's go ahead and sever and see

8  how it works out.  If he's suggesting instead that the Court

9  set a trial date as to all defendants, including those who

10 have not yet appeared in this case, there's significant due

11 process, I think, concerns with that suggestion itself.

12         If the Court does have a concern, it is inclined to,

13 you know, want to figure out ongoing progress and any sort of

14 developments, I think it is fine.  Once the Court dismisses

15 the motion without prejudice, of course we'd be happy to have

16 any sort of status hearings that the Court feels is

17 appropriate.  Obviously, in the meantime we can be updating

18 the defense counsel themselves and letting them know here's

19 our understanding, if we get an answer from Mr. Tang, happy to

20 let them know if he's made a decision about voluntary

21 surrender or not.

22         If we finally are able to have contact with

23 Mr. Sewell or clarify his counsel's situation, we can let

24 Mr. Boring and Mr. Samuel know, you know, we have clarity on

25 that or we're going to go ahead and take some sort of

1  alternative approach because counsel aren't able to confirm

2  that they represent him.

3       So those are things that we can all do to try to

4  figure out and provide the best clarity for the Court and the

5  parties in terms of when this case can proceed.  We are all

6  aligned in wanting it to proceed quickly.  It benefits no one

7  to have it delayed interminably, but it does make sense to see

8  how this plays out for a little bit of time with these

9  remaining defendants and what their intentions are so it can

10 make a reasoned decision about which defendants should be

11 tried together consistent with Eleventh Circuit authority.

12 And there's certainly no showing that the defendants have met

13 their heavy burden for compelling prejudice based on these

14 generalized allegations and claims that were made today.

15       THE COURT:  Thank you.  I appreciate all of the hard

16 work that went into this hearing.  I was struggling with the

17 issue seeing the motions that have been filed quite some time

18 ago and trying to decide what to do with them.  And although I

19 understand the concerns that the defense counsel has raised on

20 behalf of their clients, the stress of being under indictment,

21 including depression, just waking up daily with the thoughts

22 of what could happen in this case, potential effects on

23 Mr. Merani's employment and ability to see family, I agree

24 with the government that under Eleventh Circuit case law none

25 of that is sufficient to justify a severance, at least at this

1  point.  So I'm going to deny the motions without prejudice for

2  you all to raise them again.

3       Putting aside the fact that many of the defendants

4  are in Canada, if this were a case where everyone was here in

5  the United States and had not been arrested, then at this

6  point there would be no basis for a severance or I think it

7  would be very difficult to get a severance.  What makes this

8  case unique is the fact that so many of the defendants are in

9  Canada, but we've just had updates in the past week with

10  respect to, I believe, Mr. Tang.  And then we've heard -- we

11  know that Mr. Wong is going through the process and keeping an

12  eye on what happens next month when his pretrial conference is

13  to see what's going on.

14       So it feels a little too early, but at the same time

15  I am concerned with the idea that if, for example, Mr. Sewell

16  decides to exercise his rights in Canada to delay the

17  extradition process or I wouldn't say delay, take advantage of

18  all the aspects of the extradition process, that I would be

19  concerned about waiting for everyone to make it here.  And so

20  I think that's why denying it without prejudice is the

21  appropriate step, and you all can feel free to raise it again.

22       Things are happening, at least most recently with

23  Mr. Tang, and something is on the horizon with Mr. Wong.  So

24  let's just see how it goes, and I'll just say I would not

25  be -- I would not be looking forward to trying this with all

1    eight people anyway.  I think that would be difficult, and so
2    it might be that we do break it up.  But it's too early to say
3    that right now.

4         Mr. Samuel, I appreciate your suggestion of maybe
5    setting a trial date and then doing status conferences, but it
6    wouldn't -- me setting a trial date in the spring really
7    wouldn't change what's going on right now.  I think I'd be
8    opening myself up to motions to continue, and that date would
9    just be getting pushed.  The status conferences I did
10   consider.  But I trust that you all can work amongst
11   yourselves, and just bring it to me if you think, hey, we're
12   at a critical stage where it makes sense to revisit this.

13        As for Mr. Merani's passport concerns, I would
14   encourage you, Mr. Boring, to work with the government and
15   Pretrial Services.  I do think they could be accommodating for
16   those issues of you wanting to go see your dad in the old
17   folks home or get your license, and, if not, you can always
18   file a motion and we can discuss it and see what
19   accommodations we can make.

20        I thank you all for your good briefing, good
21   argument, good binder of cases, which I will hold onto because
22   we might be here again in a few months.  So thank you all very
23   much.  Any questions or anything I've left unresolved?

24        MR. SAMUEL:  I would ask you to at least consider a
25   status conference if you don't hear from us.  I know these

1  gentlemen, men and women.  I know they will keep us up to

2  date, but if there are not deadlines, lawyers just don't --

3  they don't, I think -- we're just not going to know for sure.

4  I've talked to Mr. Kitchens, and there's some things he can't

5  tell me because of, you know, the progress he's having with

6  other people.  I hope he won't be offended if 60 days from now

7  I say we still are in the dark about what's going on, can we

8  at least have a formal hearing like this because I didn't even

9  know, for example, anything about the Wongs or Sewell, not

10 that they have anything to do with my case.  Tang is the only

11 one I care about.

12        You know, if the federal defender won't talk to me,

13 which may be her proper course of action, I just want to ask

14 you if you will be offended if I -- I know you won't.  I'm

15 kidding.  But if you wouldn't mind if maybe 30 or 45 days from

16 now I say we still don't have any clarity about him, and, you

17 know, can we set October 1st as just a formal date, even a

18 written.  We don't even have to come here.  Just give us some

19 clear picture of what's going on, and if the answer is don't

20 know, you'll at least know that we're still in complete limbo.

21 That's what I'd request.

22        THE COURT:  Well, I think Mr. Kitchens is probably

23 open to that.  You all should know I look at my criminal cases

24 on a weekly basis to try to keep an eye on things, and so I'm

25 doing that.  And I am fine if you all want to reach out.  It

1  doesn't need to be a formal motion because that takes effort,

2  even just to email we can do that.  If you feel like the

3  government is not giving you enough information or you're

4  still wondering, I'm fine to have a status conference or order

5  a report.

6        MR. KITCHENS:  We obviously have no objection to

7  that.  Just to note and I think Don and I have -- whenever

8  he's had a question, I think I've tried to make myself

9  available to talk with him.  For example, he noted that he

10  just found out about the Wongs and the situation with

11  Mr. Sewell.  In my last conversation with Mr. Samuel, I made

12  it very clear he was just interested in the defendants charged

13  in the GMER.

14        I would have been happy to talk with him about the

15  other defendants or all the defendants if he wanted, but it

16  obviously is our intention to keep all the defendants and

17  defense counsel updated as soon as we hear anything from

18  Mr. Tang's counsel and regarding clarification regarding

19  Mr. Sewell as well.  So it is certainly and will be pressing

20  our hope that we'll have an answer, you know, well before 30

21  days are up.

22        THE COURT:  All right.  Well, thank you all.  We're

23  adjourned.  Have a good weekend.

24        COURTROOM SECURITY OFFICER:  Court is adjourned.

25        (Whereupon, the proceedings were adjourned at 3:30

1   p.m.)

2                          -   -   -

```
 1                      REPORTERS CERTIFICATE

 2

 3

 4          I, Wynette C. Blathers, Official Court Reporter for

 5   the United States District Court for the Northern District of

 6   Georgia, with offices at Atlanta, do hereby certify:

 7          That I reported on the Stenograph machine the

 8   proceedings held in open court on August 4, 2023, in the

 9   matter of UNITED STATES OF AMERICA v. CHRISTOPHE MERANI and

10   GLENN LAKEN, Case No. 1:22-CR-00283-VMC-CMS-7 and

11   1:22-CR-00283-VMC-CMS-8; that said proceedings in connection

12   with the hearing were reduced to typewritten form by me; and

13   that the foregoing transcript (Pages 1 through 79) is a true

14   and accurate record of the proceedings.

15          This the 14th day of February, 2024.

16

17

18

19                          _____
                            /s/ Wynette C. Blathers, RMR, CRR
20                              Official Court Reporter

21

22

23

24

25
```